E-FILED
Monday, 15 April, 2013  02:39:44 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

DONNA ENSMINGER, on behalf of N.E., )
                               )
       Plaintiff,              )
                               )
         v.                )      Case No.   12-cv-1080
                               )
MICHAEL J. ASTRUE, Commissioner,   )
                               )
       Defendant.            )
                               )
                               )

# O R D E R  &  O P I N I O N

       This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 13) and Defendant's Motion for Summary Affirmance (Doc. 15).   Plaintiff seeks judicial review of the Commissioner of Social Security's final decision to deny Supplemental Security Income ("SSI") to her minor child (N.E.).  (Doc. 1 at 1).  For the reasons stated below, Plaintiff's Motion for Summary Judgment is denied and Defendant's Motion for Summary Affirmance is granted.

## I. PROCEDURAL HISTORY

       On July 10, 2009, Plaintiff Donna Ensminger applied for SSI on behalf of her son, N.E., alleging disabilities of oppositional defiant disorder ("ODD") and attention deficit hyperactivity disorder ("ADHD"), with a disability onset date of February 15, 2005.  (R. at 14, 17).  The claim was initially denied on September 4, 2009, and again upon reconsideration on January 27, 2010.  (R. at 14).  Plaintiff then requested a hearing before the ALJ, which was held on July 7, 2010.  (R. at 14, 29, 64-65, 88).  The ALJ found that N.E. was not disabled.  (R. at 17-24).  Plaintiff

unsuccessfully appealed the ALJ decision to the Appeals Council, thus rendering the ALJ's decision as the final decision of the Commissioner of Social Security. (R. at 1-3). Plaintiff filed the present action on March 9, 2012, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (Doc. 1 at 1).

## II. FACTUAL BACKGROUND

N.E. was born on June 13, 1999. (R. at 40). At the time of the ALJ hearing on July 7, 2010, he had just completed the fifth grade. (R. at 32).

### A. Medical Evidence

#### 1. Dr. Larry Minnick

On February 5, 2007, Dr. Minnick evaluated N.E. when he was in the second grade. (R. at 217). He noted that N.E.'s prescription of Adderall did not seem to be working well for him and that his parents were having trouble getting him to go to bed at night. (R. at 217). He also noted that N.E. did not improve at school because he had continuing problems with math and cursive writing. (R. at 217). He wrote that N.E. had a short attention span and got easily frustrated when people tried to sit with him to get him to complete his work. (R. at 217). He confirmed that N.E. had ADHD and switched his prescription from Adderall to Focalin. (R. at 217).

On March 5, 2007, Dr. Minnick reevaluated N.E. to determine whether the change in medication improved his condition. (R. at 216). He documented that N.E. seemed to improve at school, but that his parents experienced increased behavioral problems with him once his medication wore off. (R. at 216). Dr. Minnick also documented other effects on N.E., such as chewing his clothes and getting up in the middle of the night to do things he should not do - for example, one night he woke

up and ate five cupcakes in the middle of the night. (R. at 216). While N.E. experienced other effects, such as occasional bouts of moodiness and poor sleeping habits, Dr. Minnick also noted that N.E.'s grades had improved, and thus decided to increase his dosage of Focalin and to supplement it with a small dosage of Clonidine. (R. at 216).

Between March 2007 and December 2007, Dr. Minnick spoke with N.E.'s parents a couple of times for updates on his condition and to modify his prescription when he had trouble staying on task. (R. at 214-15). He last evaluated N.E. on December 18, 2007, and noted that N.E. had more problems in school and a very short attention span. (R. at 213). He also noted that N.E. had problems staying on task and reportedly hurried through all his class work. (R. at 213). Dr. Minnick determined that N.E. had not improved on the medications he had tried thus far and elected to switch his prescription to Vyvanse instead. (R. at 213).

**2. Dr. Raghuram Prasad**

N.E. began seeing Dr. Raghuram Prasad for psychiatric evaluation on August 14, 2008, when he finished the third grade. (R. at 243). At the time of his visit, he was currently on a prescription for Vyvanse and Clonidine, and his parents indicated that they changed psychiatrists because they wanted to pursue treatment closer to where they lived. (R. at 243). Dr. Prasad noted that N.E. had a history of multiple hyperactivity, inattention, and impulsivity, which indicated signs of ADHD, and that he also had a history of multiple defiant behaviors indicating signs of ODD. (R. at 243, 245). Dr. Prasad also noted that N.E.'s parents had been noncompliant with getting his prescription of Vyvanse at his former mental health

center, which is why his care was transferred to Dr. Prasad's agency.  (R. at 245-46).
In his own assessment of N.E., Dr. Prasad described N.E. as pleasant, friendly,
calm, casually dressed, and well-groomed.  (R. at 245).  He wrote that N.E. had
normal speech, no tics or abnormal movements, a "happy" mood, and a goal-directed
and linear thought process, but that his insight, judgment, and impulse controls
were impaired.  (R. at 245).  Dr. Prasad ultimately diagnosed N.E. as having ADHD
and ODD and noted N.E.'s history of noncompliance with treatment.  (R. at 245-46).
He recommended that N.E. undergo behavior modification therapy in a family
setting to target his ODD symptoms.  (R. at 245-46).  From September 2008 until
August 2009, Dr. Prasad periodically met with N.E. several more times and noted
that N.E. was still not compliant with his treatment.  (R. at 234-40).

### 3. Kristy Dykima

On July 30, 2009, N.E. met with Kristy Dykima, a Qualified Mental Health
Professional, for a mental status evaluation.  (R. at 255).  Ms. Dykima documented
that N.E. reported occasional feelings of happiness and sadness, but also noted that
he shared that he did not feel sad very often.  (R. at 253).  She also noted that his
concentration had improved with medication management and that his memory
was good, but that he still had difficulty with sleeping.  (R. at 253).  She confirmed
that N.E. and his parents agreed that his treatment throughout the past year, in
the form of individual therapy, family therapy, group therapy, case management,
and psychiatric services, had been beneficial to him.  (R. at 255).  N.E. specifically
told Ms. Dykima that he was interested in sports and reading in particular, and
that his treatment over the past year benefitted him because it allowed him to

4

function better at school, decreased his temper tantrums by a reported 70%, and improved his ability to cope with frustration. (R. at 255). Ms. Dykima found N.E. cooperative and with no impairments in attention, but also found serious impairments in his ability to develop and maintain satisfactory relationships with peers or adults or to pursue educational goals in a normal time frame in a classroom setting. (R. at 253-54). She confirmed the diagnoses of ADD and ODD, and gave N.E. a Children's Global Assessment Scale Score ("CGAS") of 61. (R. at 254). A CGAS of 61 classifies a child as having "some difficulty in a single area, but generally functioning pretty well; has some meaningful interpersonal relationships; most people who do not know the child well would not consider him/her deviant but those who do know him/her well might express concern." (R. at 254). She recommended that he continue counseling, case management, and psychiatric services, as he seemed to benefit from those services. (R. at 255).

Ms. Dykima met with N.E. again on November 4, 2009, and found him to be very hyper and inattentive during their session. (R. at 251). She documented that N.E.'s father also reported more symptoms of inattention and hyperactivity due to N.E. not being on his regular medication. (R. at 251). She met with N.E. a few weeks later, and noted that N.E.'s grades dropped significantly because he did not turn in his work. (R. at 291). N.E. told Ms. Dykima that he sometimes forgot to bring his homework home and other times he would leave it at school on purpose so that he would not have to do it. (R. at 291). N.E. continued to struggle with turning in his homework at his next appointment on January 14, 2010, and told Ms. Dykima that he would purposely "forget" his work so that he could play Nintendo

DS instead. (R. at 293). Ms. Dykima suggested a behavior program in which N.E. was required to bring his homework home and complete it before being allowed to play video games. (R. at 293). She also worked on alternative behaviors with N.E. to improve the way he treated his younger sister. (R. at 293).

### 4. Dr. Jeff Leon

Dr. Jeff Leon examined N.E. on September 15, 2009 because his regular physician was unavailable. (R. at 249). Dr. Leon assessed that N.E.'s prescription regimen of Vyvanse and Clonidine seemed to work very well for him. (R. at 249). He met with N.E. again a month later to refill his prescription, and noted that while the recommended dosage of Vyvanse and Clonidine worked well, his medical card would not cover the costs, so his parents opted for a lower dosage that did not work as well for him. (R. at 248). At the appointment, Dr. Leon noted that N.E. was hyperactive, easily distracted, and more defiant towards his parents, but that he was mainly kidding around. (R. at 248). He chose to change N.E.'s medication altogether to see if that would improve his condition. (R. at 248).

### 5. Dr. Philip Woerner

N.E. met with Dr. Philip Woerner on November 4, 2009. (R. at 250). Dr. Woerner confirmed previous diagnoses of ADHD and found that N.E.'s sleep was poor with the Clonidine, so he changed his prescription to Mirtazapine. (R. at 250). On February 3, 2010, Dr. Woerner noted that N.E. had continuing problems with homework and with how he treated his younger sister. (R. at 286). He also noted other effects such as twitching, but indicated that N.E. had been sleeping and eating well. (R. at 286). Dr. Woerner wrote that while N.E.'s grades had not

6

improved, his "Connor" [sic][1] scores were better. (R. at 286). He decided to switch N.E. back to Clonidine and to decrease his dosage of Vyvanse to treat the twitching. (R. at 286). Following that appointment, Dr. Woerner met with N.E. again on March 17, 2010, and documented that at that point his grades had improved except in English class. (R. at 288). He also noted that N.E.'s tics had ceased and thus recommended to increase the dosage of Vyvanse again, and that N.E. could be taken off the Clonidine entirely because he was sleeping well. (R. at 288).

**B. Educational Evidence**

**1. Special Education Teacher Jean Sowers**

On August 20, 2009, Jean Sowers, N.E.'s special education teacher and speech therapist, completed a Teacher Questionnaire for the Social Security Administration. (R. at 136-43). She wrote that she saw N.E. 1-3 hours per day, five days per week, for the subjects of reading, math, language, and spelling. (R. at 136). Although N.E. had completed the fourth grade at the time Ms. Sowers completed the teacher questionnaire, she assessed him to be at a third grade reading level and between a first and second grade math and writing level. (R. at 136). In the domain of Acquiring and Using information, compared to same-aged children without impairments, Ms. Sowers categorized N.E. as having an "obvious problem" understanding school and content vocabulary, understanding and participating in class discussions, providing organized oral explanations and

---

[1] The Court believes this notation may refer to the Conners' Continuous Performance Test, which is a test often used in ADHD diagnosis and assessment. *See* Jeffery N. Epstein et al., *Relations Between Continuous Performance Test Performance Measures and ADHD Behaviors*, 31 J. Abnorm. Child Psychol. 543, 543-54 (2003).

adequate descriptions, learning new material, and recalling and applying previously learned material. (R. at 136-37). Additionally, she found he had a "serious problem" comprehending oral instructions and applying problem-solving skills in class discussions, and a "very serious problem" reading and comprehending written material, comprehending and doing math problems, and expressing ideas in written form. (R. at 137). Ms. Sowers specifically wrote that N.E. "needs someone to supervise him in most activities step by step or he does not stay on task or does not do things correctly." (R. at 137).

In the domain of Attending and Completing tasks, Ms. Sowers rated N.E. as having a "slight problem" carrying out single-step instructions and waiting to take turns, and having an "obvious problem" sustaining attention during play/sports activities and changing from one activity to another without being disruptive. (R. at 138). She also found that N.E. had a "serious problem" paying attention when spoken to directly, refocusing to task when necessary, carrying out multi-step instructions, working without distracting himself or others, and working at a reasonable pace/finishing on time. (R. at 138). At the end of the spectrum, Ms. Sowers classified N.E. as having a "very serious problem" focusing long enough to finish assigned activities or tasks, organizing his own things or school materials, completing class/homework assignments, and completing work accurately without careless mistakes. (R. at 138). She wrote that N.E. "rushes through work [and] has hard to read writing. He starts work before hearing directions [and] doesn't take home needed materials to get done with homework. If he gets everything home and gets work completed with help, he loses it or fails to turn it in." (R. at 138).

In the domain of Interacting and Relating with Others, Ms. Sowers also found that N.E. had a "very serious problem" asking permission appropriately and noted that he needed "constant support to stay on task and to stay organized." (R. at 139). When prompted to comment on N.E.'s abilities to move about and manipulate objects, she wrote that he "runs everywhere" and that he has "poor handwriting and spatial skills." (R. at 140). Other comments included noting that he was "very impulsive" and that "he answers before a question is complete. He starts work without reading directions. He doesn't ask for help after but should." (R. at 141). She recognized that N.E. took prescription medication on a regular basis, and that he was somewhat more able to concentrate after taking his medication. (R. at 142).

### 2. Special Education Teacher Christy Glick

On May 11, 2010, after N.E. completed the fifth grade, his special education teacher Christy Glick completed an Annual Review of his academic achievement and functional performance over the preceding year, as well as a series of Goals and Objectives for the upcoming year in his Individualized Education Program ("IEP"). (R. at 179-94). Ms. Glick described N.E. as a student who "works hard in class and tries to please his teachers. He is polite and follows the rules within the classroom setting. [N.E.] is very cooperative in class and volunteers to read aloud and to answer questions asked by the teacher." (R. at 180). Ms. Glick found that N.E. had strength in the area of reading, and while still in the resource room for reading, read at a fourth grade level and had shown great improvement that year. (R. at 180). Specifically, she pinpointed strengths in reading words correctly, but noted

9

deficiencies in vocabulary and word comprehension. (R. at 180). She also noted that in the area of written expression, N.E. still experienced difficulty writing complete sentences with correct punctuation and capitalization, and that he had difficulty focusing on one topic in longer passages. (R. at 180).

Ms. Glick observed that math, however, was the hardest area for N.E., and that he struggled with several math functions, such as understanding the concepts of decimals and fractions. (R. at 180). She explained that at times N.E. seemed to understand a given concept, but was later unable to reapply what he had learned. (R. at 180). She also noted that N.E. knew and followed the rules of the classroom most of the time, but that he experienced difficulty with organization, and still had missing or late work because he could not find it, forgot to complete it at home, or forgot to turn it in. (R. at 181). Ms. Glick found that due to N.E.'s deficit areas in reading, English, math, and spelling, he would encounter many obstacles if placed in a general education classroom and that he needed small group instruction at a slower pace for academic success. (R. at 181).

Ms. Glick recommended several supplementary aids and accommodations for N.E. to make progress toward his upcoming annual goals, such as: 1) extended time on tests; 2) tests administered in a small group setting; 3) tests modified by narrowing down choices or changing the type of question asked; 4) grading modification where a score of 50-64% is a Pass instead of a Fail; 5) tests taken in a separate location; 6) tests read aloud; 7) word banks provided for fill-in-the-blank questions; and 8) a copy of notes from the board provided to the student. (R. at 187). Ms. Glick concluded that N.E. should be placed inside a regular classroom for

40-79% of the day, as more time in a regular classroom would not give him the additional support he needed for academic success, but less time would take away from time with his peers. (R. at 190).

On June 7, 2010, Ms. Glick also completed a Teacher Questionnaire about N.E. for the Social Security Administration. (R. at 196, 203). At the time she completed the questionnaire, she saw him for two hours each day for reading, English, and spelling. (R. at 196). While N.E. was in the fifth grade, Ms. Glick found that he had a fourth grade reading level, an end of second grade math level, and a second grade writing level. (R. at 196). Ms. Glick noted that N.E. had been diagnosed with ADHD, and wrote that his impairment interfered with his ability to complete work while at school from time to time. (R. at 202). In comparing his functioning to that of same-aged children who did not have impairments in the domain of Acquiring and Using Information, Ms. Glick did not mark N.E. as having "serious" or "very serious" problems in any category. (R. at 196-97). She specifically wrote that N.E. "[was] in a small group setting for part of his classes," "able to work independently while in the general education classes," and "able to participate in class discussions, but need[ed] prompting at times to stay on task." (R. at 197).

Regarding the domain of Attending and Completing Tasks, Ms. Glick found that N.E. had a "serious" problem organizing his own things or school materials, but did not find that he had "serious" or "very serious" problems in any other category. (R. at 198). She specifically noted that N.E. "has trouble completing task[s]. He is easily distracted, but will refocus after being prompted." (R. at 198). In other areas, Ms. Glick noted that N.E. has "trouble with peers at times," and "needs

11

continued support with social skills and interacting with peers." (R. at 199). Finally, in the domain of Moving About and Manipulating Objects, she noted that N.E. "no longer need[ed] physical or occupational therapy after a re-evaluation on January 28, 2010," and found that his ability to care for himself was very close to peers of his age. (R. at 200-01).

## C. Social Security Evaluation

In an initial Childhood Disability Evaluation completed on September 3, 2009, Dr. Patricia Beers found that N.E.'s impairments or combination of impairments of ODD and ADHD was severe, but that they did not meet, medically equal, or functionally equal the Listings. (R. at 40-41, 46). Specifically, she found that N.E. had less than marked impairments in the domain of Acquiring and Using Information and marked impairments in the domain of Attending and Completing Tasks. (R. at 42). Regarding the domain of Acquiring and Using Information, Dr. Beers observed that N.E. was in regular classes, his math and writing skills were delayed, the teacher noted that he would not stay on task, and that his grades were B's and C's. (R. at 42). Regarding the domain of Attending and Completing Tasks, Dr. Beers wrote that N.E. rushed through his work, started working before instructions were heard, and either did not take his work home or lost his work when he did. (R. at 42). Dr. Beers noted that N.E.'s psychiatrist spoke at length with N.E.'s father about compliance with his treatment plan and that N.E.'s father promised to help. (R. at 45). She also noted that N.E.'s father reported that N.E. was doing very well. (R. at 45). Dr. Beers concluded her evaluation stating that credibility and compliance were poor. (R. at 45).

**D. Miscellaneous Reports**

**1. Child Age 6 to 12th Birthday Function Report**

Plaintiff completed a Function Report on behalf of N.E. on July 14, 2009, when he was ten years old. (R. at 116). She reported that N.E. had limited ability to communicate because he could not deliver telephone messages, tell jokes or riddles accurately, or use sentences with "because," "what if," or "should have been." (R. at 119). She also reported that N.E. had limited ability to progress in learning because he could not read and understand stories in books or magazines, add and subtract numbers over the number ten, or tell time. (R. at 120). Additionally, she reported that N.E.'s impairments affected his behavior with other people because he generally did not get along with his parents or other adults and did not play any team sports. (R. at 122). She reported that N.E.'s impairments affected his ability to help himself and to cooperate with others in taking care of his personal needs because he could not take a bath or shower without help, hang up his clothes, or do what he is told most of the time. (R. at 123). Plaintiff stated that N.E. had limited ability to pay attention and to stick with a task, and that he could not keep busy on his own or work on arts and crafts projects. (R. at 124).

**E. July 7, 2010 ALJ Hearing**

**1. Mr. Ensminger's Testimony**

N.E.'s father, Mr. Ensminger, appeared in the ALJ Hearing held on July 7, 2010. (R. at 29-30). Mr. Ensminger testified that N.E. took a lowered dose of medication in the summer when he was out of school. (R. at 32-33). Mr. Ensminger described N.E.'s behavior at home when his medicine was cut back, and testified

that N.E. was unruly in the morning until the medicine kicked in, acted well during the day, but could become unruly again around 6:00 P.M. when the medicine wore off.  (R. at 33).  When the medicine wears off, Mr. Ensminger testified that N.E. does not want to listen, does not want to go to bed, and does not pay attention to his parents.  (R. at 33).  Mr. Ensminger testified that N.E. is allowed to play video games if he behaves well, but whenever he does, he usually gets bored and moves on to something else after 15-20 minutes.  (R. at 33-34).  He also testified that N.E. usually gets up during the night for between half an hour and a couple hours.  (R. at 34).  N.E. had been prescribed Clonidine to aid his sleep habits, and while it helped him fall asleep, it did not prevent him from waking up in the middle of the night.  (R. at 35).

Mr. Ensminger testified that N.E. is in a special education setting at school, and that he does "somewhat" well in math but that he enjoys reading and does "all right" in reading.  (R. at 32, 35).  He also testified, however, that N.E. had trouble bringing home his homework from school and bringing home the right homework from school.  (R. at 35).  He speculated that N.E. did not bring home his assignments because he had a hard time understanding them as opposed to simply not wanting to do them.  (R. at 35-36).  Mr. Ensminger testified that N.E. sees a counselor at the West Central Mental Health Centers of Western Illinois once a month to help control his behavior and to help him remember to bring his assignments home from school and to listen to his parents.  (R. at 36).  He testified that N.E.'s counselor suggested controlling video game time based on behavior, but that N.E.'s behavior had not improved.  (R. at 36).  At the same facility, N.E. also

sees a psychiatrist who prescribes his medication once every three months.  (R. at 36-37).   Mr. Ensminger testified that his biggest concern with N.E. as far as behavior was concerned was doing "what he's supposed to be doing, and staying in bed at night."  (R. at 37).   He also testified that N.E. suffered from allergies and a stuttering problem when he got excited, but that he had not had special help or speech therapy to treat it.  (R. at 37-38).

## III. LEGAL STANDARDS

## A. Standard of Review

When a claimant seeks judicial review of the ALJ's decision to deny benefits, the Court must "determine whether [the decision] was supported by substantial evidence or is the result of an error of law."  *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).   The Court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part, that "'[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.' Substantial evidence is defined as 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).   To determine whether findings of fact are supported by substantial evidence, the Court will review the entire administrative record, but will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner."  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).   More specifically, the Court will not upset the ALJ's credibility determinations "so long as they find some support in the record and are not patently wrong."  *Herron v.*

*Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).  The Court must ensure, however, that the ALJ "build[s] an accurate and logical bridge from the evidence to his conclusion," even though he need not address every piece of evidence.  *Clifford*, 227 F.3d at 872.  If a decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**B. Disability Determination**

For a child to receive SSI disability benefits under the Social Security Act (the "Act"), he must prove that he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations," and it "has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).  The ALJ applies a three-step sequential analysis to determine whether the child is disabled under the Act.  20 C.F.R. § 416.924(a).

First, a threshold determination is made as to whether the child is presently engaged in substantial gainful activity.  *Id.*  If the child engages in substantial gainful activity, he is not disabled regardless of his medical condition(s), age, education, or work experience.  20 C.F.R. § 416.924(b).  If the child does not engage in substantial gainful activity, the next step is to consider the physical or mental impairment(s) to determine whether the child has a severe impairment or a combination of impairments that is severe.  20 C.F.R. § 416.924(a).  If the ALJ determines that the child's impairment(s) is not severe, he will determine that the child is not disabled and will not review the claim further.  *Id.*  If the ALJ determines that the child's impairment(s) is severe, he will further review the claim

to determine whether the impairment(s) meets or medically equals the criteria for an impairment under the Listing of Impairments (the "Listings"), or if it functionally equals a Listing. *Id.*

The Listings describe impairments that cause marked and severe functional limitations in children. 20 C.F.R. § 416.925(a). The ALJ determines severity by comparing the functioning of the child to children of the same age who do not have impairments. 20 C.F.R. § 416.924b(a)(1). If a child has a severe impairment or combination of impairments that does not meet or medically equal a Listing, the ALJ will analyze whether the child's impairment nevertheless functionally equals a Listing. 20 C.F.R. § 416.926a.

To functionally equal a Listing, the impairment or combination of impairments must equate listing-level severity, meaning that it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *Id.* A "marked" limitation is defined as one that interferes "seriously" with a child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is defined as one that interferes "very seriously" with a child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). The ALJ considers six domains of functioning to make this assessment: 1) Acquiring and Using Information; 2) Attending and Completing Tasks; 3) Interacting and Relating with Others; 4) Moving About and Manipulating Objects; 5) Caring for Yourself; and 6) Health and Physical Well-being. 20 C.F.R. § 416.926a(f)-(*l*). To assess whether a child's limitations are severe or whether they functionally equal a Listing, the ALJ

17

considers both medical and non-medical sources, such as information from parents, teachers, and others who know the child.  20 C.F.R. § 416.924a(a).  If the child has an impairment(s) that meets or medically equals the requirements of a Listing or that functionally equals a Listing, and also meets the duration requirement, the ALJ will find him disabled.  20 C.F.R. § 416.924(d)(1).  If not, he will find the child not disabled.  20 C.F.R. § 416.924(d)(2).

## C. ALJ Opinion

The ALJ followed the three-step evaluation process to determine that N.E. did not qualify for disability benefits.  (R. at 14-24).  First, the ALJ found that N.E. had not engaged in substantial gainful activity since July 10, 2009, the date of application.  (R. at 17).  Next, he determined that N.E. had a learning disability, ODD, and ADHD, and considered them all severe impairments.  (R. at 17).  He noted that the medical evidence revealed that N.E. had been diagnosed with and received treatment for his impairments and that objective evidence confirmed that his impairments affected his ability to perform some activities.  (R. at 17).  In the last step, however, the ALJ concluded that N.E. did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Listings.  (R. at 17).  Moreover, he also found that N.E. did not have an impairment or combination of impairments that functionally equaled a Listing.  (R. at 17).

The ALJ referred to records and reports from medical sources where N.E. underwent counseling and psychiatric evaluations, reports from his parents about his behavior at home, and academic reports to evaluate N.E. under the six domains

of functioning.  (R. at 17-24).  The ALJ found that N.E. had less than marked limitation in the domain of Acquiring and Using Information and marked limitation in the domain of Attending and Completing Tasks.  (R. at 18-20).  He did not find limitations in any other domains.  (R. at 21-24).  Because N.E. did not have marked limitations in two or more domains, the ALJ concluded that his impairments did not functionally equal a Listing, and thus, he was not disabled under the Act.  (R. at 17-24).

## IV. DISCUSSION

Plaintiff raises three arguments to contest the ALJ's decision to deny her son disability status, and thus to deny him SSI: 1) The ALJ committed reversible error when he failed to find that N.E. did not have a marked limitation in the domain of Acquiring and Using Information; 2) In determining the severity of N.E.'s limitations, the ALJ did not take into consideration the extensive help that N.E. needed to get him through his school day, as required by SSR 09-1p; and 3) Because N.E. clearly has marked limitations in two of six domains of functioning, he is entitled to be found disabled.  (Doc. 13 at 4-5).  The Court will address each argument in turn.

### A. The ALJ Did Not Err in Finding That N.E. Did Not Have a Marked Limitation in the Domain of Acquiring and Using Information

Plaintiff argues that the ALJ erred when he found that N.E. did not have a marked limitation in the domain of Acquiring and Using Information based on Ms. Sowers' and Ms. Glick's 2009 and 2010 Teacher Questionnaires.  (Doc. 13 at 5).  She asserts that the ALJ erroneously deduced improved performance between 2009-2010 because he failed to accurately compare Ms. Sowers' 2009 evaluation, where

N.E. had "serious" to "very serious" problems in multiple activities, to Ms. Glick's 2010 evaluation, where he did not have "serious" or "very serious problems" in any activities.  (Doc. 13 at 5-6).  Plaintiff explains that the ALJ overestimated N.E.'s improvement and reached an inaccurate conclusion, because he did not consider the fact that N.E. needed significantly more special education instruction in 2010 to achieve only a marginal improvement.  (Doc. 13 at 5-6).

This assertion, however, is not correct.  First, Plaintiff erroneously interprets Ms. Glick's 2010 questionnaire as indicating that N.E. required daily special education services of 145 minutes for reading, 145 minutes for math, and 130 minutes for written language, which is a sharp increase from the 60-180 daily minutes of special education services he received in 2009.  (Doc. 13 at 5-6; R. at 136, 196).  What Plaintiff reads as a number "1," however, is actually a slash, such that N.E. actually only received 45 minutes per day of special education services for reading, 45 minutes for math, and 30 minutes for written language in 2010.  (R. at 196).  Plaintiff should have noted this fact herself, as in her own brief she mentions that Ms. Glick saw N.E. for two hours each day, but then continues to assert that he received 420 minutes of combined daily special education services for reading, math, and written language.  (Doc. 13 at 5-6).  Simple arithmetic negates this assertion though, as that amount equals seven hours a day, exceeding the entire instructional school day.  Thus, the proposition that N.E. received significantly more special education in 2010 is simply not true.

Furthermore, the ALJ specifically noted that "school records show the claimant had been receiving special education resources for 35 percent of the time

during the school years 2009 through 2010 with his time outside the [regular] classroom being increased to 42 percent during the 2010 to 2011 school years." (R. at 19). This citation clearly demonstrates that the ALJ realized exactly how much special education N.E. received when making his determination in 2010, and even with a proposed increase in special education services for the upcoming 2010-2011 year, he still did not consider N.E. to have a marked limitation.

Plaintiff next argues that the ALJ erroneously concluded that N.E.'s improvements were supported by notes from mental health specialists. (Doc. 13 at 9). Specifically, she cites to Dr. Woerner's note in February 2010 stating that N.E.'s grades had not improved. (Doc. 13 at 9). In the same paragraph though, Plaintiff concedes that Dr. Woerner's March 2010 assessment indicated that all of N.E.'s grades improved except in English. (Doc. 13 at 9). Plaintiff dismisses the grade improvement as woefully underwhelming, but this Court will not insert its own subjective opinions into the matter. Rather, it will only look to determine whether the ALJ's assessment lacks evidentiary support or an adequate discussion of the issues, *Clifford*, 227 F.3d at 870, and here, the assessment neither lacks evidentiary support nor an adequate discussion of the issues.

Plaintiff also asserts that pursuant to 20 C.F.R. § 416.926a(e)(2), the Court should find that N.E. has a marked limitation because his test scores were between two and three standard deviations below the norm for the test. (Doc. 13 at 8). Here, again, Plaintiff's calculations are incorrect. Standardized test scores that are two or three standard deviations below the mean equate to scores that are either in the lowest 2.5% of the distribution or the lowest one-half of 1%. *Sanchez v.*

21

*Barnhart*, 467 F.3d 1081, 1082 (7th Cir. 2006).   Plaintiff concedes that N.E. performed better than 47% of students nationally in reading and better than 5% of students in mathematics.  (Doc. 13 at 8).  Thus, neither of these scores classify as the lowest 2.5% or the lowest one-half of 1% of the distribution.

The Court's standard of review in this case is to determine whether the ALJ reached a decision supported by substantial evidence.  *Rice*, 284 F.3d at 369.  The goal is to assess whether the ALJ adequately considered enough evidence to sustain his ruling.  The goal is not, however, to "reweigh the evidence" or to "substitute [the Court's] own judgment" for evidence that has already been considered.  *Clifford*, 227 F.3d at 869.  Here, contrary to Plaintiff's assertions, the ALJ did in fact take note of the amount of special education services N.E. needed, and the disparity between the amount of special education services provided in 2009 and 2010 was not as significant as Plaintiff asserted.  Considering the totality of the circumstances, the ALJ determined that N.E.'s better grades and ability to work independently in general education classes demonstrated a "significant improvement" in his performance such that he did not have a marked limitation in the domain of Acquiring and Using Information.  (R. at 19).  Accordingly, the Court finds that the ALJ adequately supported his conclusions with evidence from multiple sources in the record, and thus rejects Plaintiff's argument that the ALJ erred in not finding that N.E. had a marked limitation in the domain of Acquiring and Using Information.

**B. The ALJ Sufficiently Complied With the Requirements of SSR 09-1p**

Plaintiff next argues that the ALJ erred in his decision because when he considered the severity of N.E.'s limitations, he did not consider the extensive help N.E. required to function independently and to get him through his school day, as required by SSR 09-1p. (Doc. 13 at 9-10); SSR 09-1p, 2009 WL 396031 (Feb. 17, 2009). SSR 09-1p states:

> It is important to determine the extent to which an impairment(s) compromises a child's ability to independently initiate, sustain, and complete activities. To do so, we consider the kinds of help or support the child needs in order to function. See 20 CFR 416.924a(b). In general, if a child needs a person, medication, treatment, device, or structured, supportive setting to make his functioning possible or to improve the functioning, the child will not be as independent as same-age peers who do not have impairments. Such a child will have a limitation, even if he is functioning well with the help or support.

2009 WL 396031 at *9. This provision indicates that needing help implies some level of limitation, with the amount of help needed directly correlating with the severity of the limitation. Here, the ALJ did find that N.E.'s need for special education assistance demonstrated that he had a limitation in the domain of Acquiring and Using Information, but did not find that the additional help rose to the level of having a "marked" limitation. (R. at 19). The ALJ specifically referenced Ms. Glick's 2010 questionnaire, in which she wrote that "[N.E.] is able to work independently while in the general education classes." (R. at 19, 197). Ms. Glick also found that N.E.'s ability to care for himself was very close to peers of his age. (R. at 201). Thus, while N.E. was clearly limited in some aspects because he needed help to improve his functioning, he did not need so much help as to make him "markedly" limited. Moreover, as the Court discussed above, it rejects

Plaintiff's assertion that N.E. needed "significantly more special education instruction under Ms. Click's[sic] instruction in 2009-2010 than under Ms. Sowers' instruction in 2008-2009."  (Doc. 13 at 10).

### C. Plaintiff Does Not Have Marked Limitations in Two of Six Domains of Functioning and Thus Is Not Disabled

The ALJ found that N.E. had a marked limitation in the domain of Attending and Completing Tasks, less than a marked limitation in the domain of Acquiring and Using Information, and no limitations in any other domain.  (R. at 17-24).  For the reasons stated above, the Court finds that the ALJ adequately supported his conclusions with substantial evidence such that the Court may accept his findings. Accordingly, the Court finds that N.E. does not have marked limitations in two of six domains of functioning, and therefore is not considered disabled and not entitled to SSI under the Act.

## V. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 13) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 15) is GRANTED.  CASE TERMINATED.


Entered this 15th day of April, 2013.


                        s/ Joe B. McDade
                    JOE BILLY McDADE
                    United States Senior District Judge